UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 26-CR-20073

UNITED STATES OF AMERICA

v.

RISHI KAPOOR,

Defendant.
_______________________________/

# DEFENDANT'S SENTENCING MEMORANDUM

## A. Introduction

Rishi Kapoor entered a guilty plea to two counts of the indictment: Count 10, Money Laundering the proceeds of wire fraud, and Count 13, a §371 conspiracy to defraud the United States with a payroll tax offense object of the conspiracy. Other charges related to bank fraud and Mr. Kapoor's failure to pay his personal income taxes are to be dismissed as part of the plea agreement.

The Sentencing Guidelines prescribe a sentence of 151 – 188 months, but the defense and the government have agreed to recommend a two-level downward variance to reflect the amendment to the fraud loss table based on the inflation adjustment adopted by the Sentencing Commission and scheduled to become effective November 1, 2026, absent congressional disapproval. The agreed variance would reduce the sentence range to 121 – 151 months. The defense has agreed to recommend a sentence of 121 months; the government has agreed to recommend a sentence of 136 months.

The case involves losses to investors caused by the demise of Location Ventures, a real estate company that acquired and developed properties—houses, apartment buildings, office

buildings, and condominiums—and the related money laundering of proceeds and unpaid payroll taxes to which Mr. Kapoor has pled guilty. This was not a "Ponzi" scheme. Homes were being built, apartments were being constructed, office buildings were completed, and condominiums were underway.

The plea agreement and factual proffer estimate the fraud loss as $89 million dollars based primarily on the amount of money Mr. Kapoor raised from all investors in the Location Ventures companies during the nearly 9-year period covered by the indictment. *See* Proffer, ¶ 19. The government does not contend that Mr. Kapoor received fraud proceeds anywhere near that amount. The factual proffer specifies that he received a total of $2,828,000 million dollars from the criminal conduct. That amount reflects what Kapoor received in excess of what he was entitled to by way of salary, permissible fees, and his share of the profits pursuant to the partnership operating agreements of the various real companies. Thus, to the extent the Sentencing Guidelines sometimes use gain to the fraudster as an appropriate surrogate for actual loss, that construct would produce a "loss" of between 1.5 and $3 million, reducing Mr. Kapoor's base offense level from a 24 to a 16.

Of the estimated $89 million "actual" fraud loss applied here, approximately half that amount reflects the investment of two "insider," highly sophisticated businessmen whose own self-dealing contributed significantly to the ultimate demise of Location Ventures and the losses suffered by other, smaller investors. One investor ("AK"), a prominent board member of the parent company, demanded (coupled with threats of reputational damage and violence directed at Mr. Kapoor, his family and members of the company) that his $45 million dollar investment be returned to him, ultimately leading to the appointment of a receiver and the collapse of the company. The second largest investor ("MH") also profited handsomely from the interest on his

loans (including extremely high default interest that kicked in as the company collapsed) and the ultimate transfer of properties to him.

The total restitution due to the investor victims – which in this case is not co-extensive with the fraud loss under the Guidelines – has yet to be determined. The restitution estimate included in the factual proffer was based on the government's preliminary review of the Location Ventures records. Since then, additional review by the parties has established that a number of the investors on the government's initial list had, in fact, been made whole (many with substantial profit) well before concerns about Mr. Kapoor's conduct were raised.[1] The parties and the investors are currently attempting to reach agreement on the total amount owed. The government's current estimate is approximately $71 million while the defense's current estimate is approximately $35 million. Significantly, of the roughly $36 million difference between the two, nearly $30 million involves the parties' alternative assessments of the value of membership shares in two LV projects transferred to AK and the third largest investor group as part of a negotiated agreement with the initial receiver during the wind down of the LV companies in the summer of 2023.

**B. <u>The Background of the Location Ventures Real Estate Companies</u>**

Rishi Kapoor graduated from University of Miami law school in 2009. He began a career in real estate marketing and sales. By the time he was 31 years old, he had started his own real estate development firm that later became Location Ventures ("LV"), the focus of this case.

He raised money from investors to buy land and build homes, apartments, office buildings, mixed use projects, and condominiums. Most of the investors were experienced, sophisticated investors, who knew the risks and rewards of real estate investing. Over the next eight years (from

[1] This information impacts the estimated fraud loss (although not the agreed fraud loss range) as well as the restitution number. *See* U.S.S. G. § 2B1.1, Application Note 3D(i) **("**Credits Against Loss").

2016 – 2023), homes were built; condominiums and apartments were constructed; office space was renovated, leased and sold.

The structure of his companies changed over time. At the outset, each development project was governed by a separate partnership operating agreement and had its own investors who contributed capital. In 2021, a separate partnership was formed, Location Ventures (hereinafter "LV"), which became the parent company for all the individual project partnerships as part of a "roll-up."[2] A separate parent company, Urbin, was also formed. Like LV, it also had its own lower-level partnerships for individual projects. Thus, there were two parent companies (LV and Urbin) and at least a dozen individual project partnerships that were developing and building homes, apartments, and condominiums.

Rishi Kapoor was paid a salary by LV, which began at approximately $100,000 per year, but increased to $300,000 and then to $400,000 per year. In addition, he was entitled to receive a fee from various individual projects when he signed a loan guarantee, when he acquired property for a project, and in some projects, when he successfully achieved capital formation (through loans or equity). These fees were explicitly authorized in the project operating agreements – in addition to his LV salary and profit distribution. LV, the parent company, also received payments from the various projects for marketing, management, and other services it provided. Profits earned by LV were then distributed to the partners of LV, including Kapoor.

[2] As the factual proffer acknowledges, Kapoor misrepresented to his investors that Patriots United (made up of Kapoor, his partner, and his family) made an initial capital contribution of $13 million "in cash" to LV when Patriot's actual contribution was approximately half that. Patriots United did contribute valuable properties owned by the pre "roll-up" projects they owned at the time LV was formed. Although these real estate contributions were not "cash" investments when made, they had been developed using an initial $8 cash million family investment. While the increased value of the "General Partners' Interest" increased the $8 million significantly, admittedly that was not "cash."

There were scores of investors in the companies. Some investors invested at the project level; some investors invested at the LV or Urbin level. Some investors had investments in more than one project, or an investment in a project and an investment in the parent company, LV. Approximately a dozen investors invested $1 million or more. As noted above, one investor, ("MH") invested a total of approximately $10 million, in addition to various loans that were repaid with interest. Another investor ("AK") invested a total of approximately $45 million.

Many investors were rewarded over the years with substantial profits, interest, and repayment of capital. Among the successful developments was the Orduna property which generated about $3,700,000 in profit after its 2022 sale for a then Miami-Dade record price per unit for a multi-family (apartment) building. The Orduna project involved developing high-end student and family housing across from the University of Miami. Between 2017 and 2022, hundreds of individuals and families lived in these renovated units. The 2022 sale of the project resulted in profits for all the initial investors; all project level investors received back their initial investments plus a 40-70% return on their investments.

In 2021 and 2022, the company delivered 36 luxury condos in the Villa Valencia project. When the initial buyers purchased units, the price was between $600-800 per square foot. Now the units are selling for more than $1,400 per square foot, generating substantial profits to the early project buyers.

In 2019 - 2023, the company operated the Commodore Inn in Coconut Grove, a 20-unit apartment building with extended stay leases. Hundreds of tenants leased units over the four years, generating approximately $1.5 - $2 million of operating income for the project.

Over the years, the company leased and managed over 100,000 square feet of office space throughout South Florida, also generating millions of dollars in operating income to the projects.

These projects and others resulted in payroll to contractors and vendors in excess of $50 million from 2017 – 2023. Over 100 people were employed by LV over the years and perhaps another 1,000 people were paid as laborers and contractors. Property taxes and permit fees were paid in excess of $3 million dollars.

The point is this: Location Ventures was not a Ponzi scheme. It was a successful operation, even during the Covid years, and, while Mr. Kapoor admits to the criminal conduct to which he pled, nothing about this operation supports a suggestion that he was simply swindling his investors.

**C. Kapoor's Compensation**

The PSR accurately recites that Kapoor received $6 million over the course of eight years. But that $6 million included his authorized salary, profit distributions, and fees he earned and was entitled to pursuant to various Project Operating Agreements. The $6 million also included improper fees to which he was not entitled.

Specifically, Kapoor received a payment in the amount of $1.5 million (2021) and another in the amount of $1.328 million (2022). While these payments included several project level fees to which he was entitled by the operating agreements and certain legitimate profit distributions from LV, they also included fees that were taken prematurely and others that were not authorized in the operating agreements, including, for example, fees based on his procurement of equity investments in certain projects.[3]

[3] The government's sentencing memorandum states that Mr. Kapoor was "quibbling with the factual proffer" in regard to these payments. (ECF #58, p. 5). The defense has presented emails and other documents to the government, located during discovery review after the plea and proffer, that support his position that some portion of these payments were permitted. Perhaps this is "quibbling," but it is also appropriately described as "accurate" – while still acknowledging guilt. In any event, the amount of unapproved fees is not a component of the fraud loss, which is entirely comprised of investor losses, not Kapoor's improper gains.

Because Kapoor had legitimate sources of income, including salary, fees, and profits to which he was entitled (not to mention significant personal loans from family), the government's characterization of Kapoor's spending as "lavish" is both overstated and of limited relevance to sentencing.[4] The mere fact that he made expensive purchases does not establish that those purchases were funded with investor money, furthered the offense, or caused any investor loss.

**D. <u>The Demise of LV</u>**

The demise of LV was precipitated when its largest investor – AK – became concerned about Kapoor's management of the company, demanded the return of his entire investment, and threatened Kapoor (physically, reputationally, and financially) if he did not comply with the demand.[5] There was no provision in the operating agreements that authorized an investor to insist on the return or redemption of his investment on demand. Nevertheless, AK demanded his money back and threatened to ruin the company and Kapoor personally if his demand was not met. For the next year, Kapoor, with the assistance of MH and other investors, as well as the advice of

---

[4] And, regardless of whether or to what extent Kapoor's lifestyle during the period of the offense conduct has relevance, the government's suggestion in its Sentencing Memorandum (ECF 58, p. 2) that Mr. Kapoor lived large after he was removed from LV, sued by the SEC, and had lost virtually everything, including his home, boat, and bank accounts, is perplexing. The "luxury automobile" the government complains he was driving after he and his wife decamped to a rental home in Atlanta to support and be supported by his elderly father is a 2020 Range Rover purchased in 2020 in part with a trade-in of Mrs. Kapoor's 2015 car. The parties agree the 2020 car has a current value of $33,000, of which Mr. Kapoor has agreed to forfeit his interest of $15,500. It was the couple's (and now Mrs. Kapoor's) only car. The government also protests Mr. Kapoor's presence, with his wife, at a college football game in 2026. Mr. Kapoor was given a ticket to attend the game from a friend (only one ticket, his wife did not go to the game) where he sat in the alumni nosebleed seats.

[5] The full extent of AK's wealth is not known to Kapoor or the defense, but it is likely his wealth is in the hundreds of millions of dollars (he boasted to Kapoor that he was "taking home" over $10 million per month; and had a net worth exceeding $500 million). He is the CEO of National Debt Relief, Inc. and a substantial investor in South Florida real estate: investments exceeding $30 million for a Fort Lauderdale location; $11 million for property in Wynwood; and $44 million for property in Miami Beach to purchase his personal home (along with another $60 million in construction costs alone).

counsel, endeavored to meet AK's demands and remove him from the company rather than engage in litigation or an entanglement that would further drain business assets. Kapoor's goal, unsuccessful as it turns out, was to save LV and avoid losses to the other investors.

To buy AK out of the companies, Kapoor structured a series of transactions that allowed LV to pay AK the initial required payback amount ($26,00,000 million in cash between late 2022 and the spring of 2023). But, when Kapoor fell behind in funding AK's remaining buyout demand of approximately $20 million, AK threatened him and other investors *not* to place the company in involuntary bankruptcy (which could have resulted in the claw back of AK's buyout money) and insisted, instead, that a receiver be put in charge of an LV wind down. LV removed Kapoor, appointed the receiver, and ultimately the companies were shuttered and many investors suffered substantial losses. However, in the process, AK negotiated the purchase from the receiver of LV's remaining membership interests in two valuable projects (551 Bayshore and 1505 Ponce). The value of those interests will be a critical component of what, if any, restitution is due to AK or his other LV investor partners.[6]

---

[6] AK's purchase of LV's shares in the 551 Bayshore Project gave him, together with the third largest LV investor group, control over LV's contractual option to purchase a highly valuable piece of waterfront land on the island of Fort Lauderdale Beach, including LV-obtained development approvals, up-zoning for density and height, and a branding & licensing deal with Marriott International. AK and his partners have since exercised the option and purchased the property. They are now developing a Ritz Carlton Residences condo project. The project launched sales earlier this year and is projecting $350-450M of sales according to press releases and its sales brokerage, Douglas Elliman.

AK's purchase of LV's shares in the 1505 Ponce Project gave him, together with his partners, ownership of nearly 1.7 acres of prime downtown land along with transferable development rights (TDRs) from the city to add to the development's available buildable and sellable SF. The property was heavily encumbered, and AK and his partners eventually fell behind on the mortgage payments, resulting in foreclosure and purchase by MH. However, at the time it was transferred from the receiver, the 1501 Ponce property had significant value in an amount yet to be resolved.

This discussion is not meant to suggest that AK's wealth or tactics renders him, or anyone else, immune from fraud or its consequences. However, it is relevant to the restitution analysis, and to the overall analysis of the circumstances of the offense, that AK was a highly sophisticated, high net-worth, professionally advised investor who took immediate steps to protect – and in the defense view – enhance the value of his investment in LV once he decided he had enough, by wielding his significant leverage as the dominant investor in LV to demand a buy-out that virtually ensured the collapse of the companies to the detriment of other investors, and then by executing a negotiated purchase from the receiver of the most valuable assets left on LV's books at very favorable prices.

The second largest investor was M.H. He invested $10 million and made secured loans to various of the entities (and to Kapoor personally) in the approximate amount of $80 million. MH helped Kapoor design and implement the preferential payouts to AK—described in the indictment and factual proffer as involving the misuse of investor funds and construction loan proceeds. In fact, MH made the construction loan and other investments in LV Projects used to provide cash to LV which, in turn, made the payments to AK. This was a voluntary and knowing decision on his part and the loans were all paid back with significant interest or offset with the transfer of property to MH in lieu of cash payment on the loans. He is now the owner of 1505 Ponce (which he acquired from AK in foreclosure), and another property known as Commodore.

**The Guidelines**

The Plea Agreement makes a joint recommendation as to the appropriate guideline calculation. The calculation results in an advisory guideline range of 121 – 151 months. Mr. Kapoor has agreed to recommend a sentence at the low end of the range (121 months) and the government has agreed to recommend a sentence in the middle of the range (136 months).

However, the sentencing decision is, of course, in the Court's hands. And in determining the sentence (whether it agrees with the defense request, the government's request or neither), the Court may and should consider the extent to which the Guidelines—particularly the use of the frequently criticized "fraud loss" construct—fairly measures Mr. Kapoor's moral culpability for the offenses of conviction.

Here, the fraud-loss calculation of $89 million is the primary driver of the advisory Guidelines range of ten years or more. Mr. Kapoor did not receive $89 million in ill-gotten gains—or even one-tenth of that sum. Investors likewise did not lose $89 million.[7] This is not to minimize the seriousness of Mr. Kapoor's admitted conduct or the real losses suffered by investors. But the Guidelines' rigid, loss-driven framework treats all fraud cases and defendants as if they were identical. That one-size-fits-all approach simply does not work in many, if not most, cases. It is no substitute for the court's individualized determination of a sentence that is sufficient, but not greater than necessary, to achieve the purposes of sentencing under 18 U.S.C. § 3553(a).

The dissatisfaction of litigants and the judiciary with the fraud guidelines has increased over time. Since Judge Rakoff denounced the rigidity of the fraud loss guidelines in *United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006), courts have disregarded the guidelines in increasing numbers and granted substantial and then larger variances year after year.

The United States Sentencing Commission documented that in 2025, while approximately 31% of all guideline sentences were subject to a variance, in cases using the fraud guidelines, over 40% of sentences were subject to a variance (USSC, 2025 Sourcebook of Federal Sentencing Statistics, Table 31). And regarding within-guideline sentences, over 50% were sentenced at the

[7] This is not a case involving "intended loss" which may apply when the defendant does not succeed in his effort to defraud others.

guideline minimum (*Id.* Table 34). Moreover, when a sentence was subject to a downward variance, the mean decrease was 17 months below the low end (a reduction of over 56%) (*Id.* Table 40). In the Southern District of Florida, of the 224 fraud defendants who were sentenced in 2025, only 5 received a sentence exceeding 10 years (representing fewer than 2% of all fraud sentences).

In prior years, the numbers were no different. In this District in 2024, 288 fraud defendants were sentenced, and only 7 received a sentence exceeding 10 years. Nationwide in 2024, 38.8% of the fraud defendants received a variance from the guideline sentence. And for those who were sentenced within the guideline range, 53% were sentenced to the minimum of the range (USSC 2024 Sourcebook, Table 34).

So, the average sentences (mean and median) nationwide, the sentences in the Southern District of Florida, and the sentences in the Southern District of New York (arguably the epicenter of fraud prosecutions), all reflect a consistent tendency towards significant variances, suggesting a widespread dissatisfaction with the fraud loss guidelines as an accurate measure of culpability. The following cases are illustrative.

Elizabeth Ann Pierce received five years despite forging contracts to secure over $270 million. *United States v. Pierce*, No. 1:18-cr-00388-ER (S.D.N.Y. June 26, 2019). In that case, Ms. Pierce pleaded guilty to forging contracts in order to secure more than $270 million in investments, with both institutional lenders and individual investors as victims. Govt's Sentencing Submission, *United States v. Pierce,* No. l:18-cr-OO388-ER (S.D.N.Y. July 1, 2019), ECF No. 48, at 4. Despite the deliberate falsification of core business contracts and a loss figure far higher than that alleged in Mr. Kapoor's case, the court imposed a sentence of five years. Judgment, *United States v. Pierce*, No. 1:18-cr-00388-ER (S.D.N.Y. 2019), ECF No. 50.

Even Elizabeth Holmes, whose fraud endangered patient health and defrauded multiple investors of $121 million, received only 135 months' incarceration after losing at trial, and never accepting responsibility. *United States v. Holmes*, No. 5:18-cr-00258 (N.D. Cal. 2022). Ms. Holmes was convicted by a jury on one count of conspiracy to commit fraud on investors and three counts of wire fraud for orchestrating a company that was fraudulent at its core. Theranos's technology never worked, its blood-testing products were a fiction, and her conduct endangered patient health while defrauding more than ten investors of approximately $121 million.

A recent S.D.N.Y. case, *United States v. Javice*, 1:23-cr-251-AKH (ECF 417), involved an undisputed $178,000,000 fraud, with a properly-calculated guideline range of 210 – 262 months, (after convicted at trial and thus no acceptance of responsibility reduction), but the court imposed a variant sentence of 85 months based on the §3553(a) factors, despite the fact that she personally received in excess of $25 million of fraudulent proceeds.

In *United States v. Gupta*, 904 F.Supp.2d 349 (S.D.N.Y. 2012), Judge Rakoff began by once again bemoaning the rigid exercise of Guideline sentencing:

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts, and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results. *Id.*, at 350.

He then explained that the ratcheting-up of white-collar sentences was in part Congressionally mandated to address the massive frauds of Enron and WorldCom. Sentencing those defendants to 20 – 30 years was what Congress intended. But the solution resulted in a

massive increase in *all* white-collar crimes, large, medium, and small. The inflated fraud table virtually assured that, absent a substantial variance, any fraud case would result in a typical sentence as much as 500% more serious than the same fraud case a couple years earlier. Perhaps this eliminates disparity; but so would the death penalty for one and all. The fraud table, as the dominant factor in most fraud cases, treats the kaleidoscope of different fraud offenses as one and the same: $89 million is $89 million. Period. That fact that Mr. Kapoor received 1/45 of the actual fraud loss as calculated under the Guidelines makes no difference.

Judge Rakoff, however, believed these types of facts makes all the difference in the world. Prefacing his final imposition of sentence, he wrote,

> The Court is nonetheless mandated to calculate the defendants Guidelines range ... even if, as the Court now holds, the non-guideline sentence that it intends to impose would not vary one whit if the Guidelines calculation was that proposed by the Government, that proposed by the defendant, or anywhere in between. *Id.* at 352.

Ultimately, the *Gupta* Guideline range resulted in an advisory range of 78 – 97 months, but the court, considering all the § 3553(a) factors imposed a sentence of 24 months.

Another E.D.N.Y. case also challenged the validity and logic of the fraud table. *United States v. Parris,* 573 F.Supp.2d 744 (E.D.N.Y. 2008). Judge Block began his opinion in this "pump and dump" securities fraud case leaving nothing to the imagination: "This case represents another example where the guidelines in a securities fraud prosecution have so run amok that they are patently absurd on their face." *Id*. at 745. Nothing pianissimo about those introductory remarks. In fact, though the guidelines summoned a sentence of 360 months, Judge Block reasoned his way to a sentence of 60 months. Along the way, he quoted Judge Rakoff's earlier opinion in *United States v. Adelson*, 441 F.Supp.2d 506, 512 (S.D.N.Y. 2006), describing "the travesty of justice that sometimes results from the guidelines' fetish with

absolute arithmetic as well as the harm that guideline calculation can visit on human beings if not cabined by common sense."[8]

No wonder commentators have concluded,

> "Especially as the loss amount increases into the millions, the sentences recommended by the loss table are widely viewed as unduly severe, increasingly arbitrary, and manifestly disproportionate to the non-violent nature of the underlying economic crimes. Boss & Kapp, How the Economic Loss Guideline Lost Its Way, and How to Save It, 18 Ohio St. J. Crim. L. 605, 619 (2021).

Mr. Kapoor is *not* urging the court to vary from the agreed-upon guideline range. He is requesting that the Court consider all the relevant facts and conclude that a "bottom of the range" sentence is the appropriate sentence that should be imposed. The defendant's request reflects the same concern that caused these other courts to conclude that a variance was the appropriate response to what they perceived to be an artificially high guideline calculation. The defendant's modest request is that the same concerns support a low-end sentence here.

Loss as the anchor for a sentence of imprisonment in a fraud case is bound to be misguided. Absent from this anchor is any consideration of:

(1) Did the defendant receive money (or intend to receive money) equal to the fraud loss?

(2) Was the defendant intent on stealing the money of his investors and providing nothing in return (a Ponzi scheme, for example, or a "sale of the Brooklyn Bridge" type of fraud)?

---

[8] The only comparator offered by the government is *United States v. Jean Joseph*, 25-CR-20483-Martinez. There, the defendant's fraud involved a brazen Ponzi scheme committed shortly after his conviction of a prior federal fraud offense, and part of the fraud for which he was most recently convicted was committed from his federal prison cell. He was certainly not a Criminal History I offender and his offense differed in kind and degree from Mr. Kapoor's.

(3) Did the fraud that was alleged and proven in the indictment *cause* the loss to the investors?

And, indeed, while Mr. Kapoor has pleaded guilty here, even the complexity and imprecision of determining the amount of the fraud loss *caused* by the offense conduct is worth serious consideration in evaluating the "nature and circumstances of the offense" as required by Section 3553 (a). As noted above (and in the PSR, ¶ 25), the indictment and proffer describe a number of fraudulent acts: Not paying personal income taxes; using condominium deposits for unapproved development costs in violation of state law; receiving fees that were not approved by the operating agreements; using construction loan money to pay AK his return of capital. What is not evident, is whether all this conduct *caused* investors to lose money. Rishi Kapoor's failure to pay his personal income taxes or failure to pay over to the IRS money withheld from his employees' paychecks did not result in any loss to any investor. His receipt of some fees prematurely, or in an excess amount, may have caused some loss to some investors, but it does not account for anywhere near $89 million in loss.

In *United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017), a case arising in the Southern District of Florida, the appellate court addressed the proper method for determining loss in a case such as this one in which the government relied on "actual loss" as the appropriate measure under the Guidelines. The *Stein* defendant was convicted of issuing false press releases and fabricating purchase orders in order to inflate the value of his publicly traded company and thus increase stock prices. Because the government and the district court relied on the "actual loss" method of determining loss, the government was required to prove both that the actual loss was *reasonably foreseeable to the perpetrators* and that there was "but for" causation that tied the false statements to the loss. The same proof is required in order to fix the restitution amount. The government,

however, failed to prove how many investors actually read or relied on the false statements in purchasing stock in the company. In other words, there was an inadequate showing of reliance by the victims, either through direct evidence or circumstantially. The court also addressed the absence of proof of "legal causation"—that is, *the existence of intervening events* that may have contributed to investors' losses.[9]

Here, the LV investors were not investing in an entirely fraudulent venture. LV and the projects all had value – considerable value in land and buildings. Though some investors lost their entire investment, that does not necessarily equate to a finding that their investments (and resulting losses) were entirely the product of fraud. Consider, in contrast, the decision in *United States v. Horn*, 129 F.4th 1275 (11th Cir. 2025), in which defrauded victims tried unsuccessfully to rely on *Stein:*

> Horn says that the actual value of Sunset shares should be deducted from the loss amount because "[i]t's not like Sunset was selling shares in a unicorn farm. Sunset stock had *actual value* . . .." But Sunset *was* a "unicorn farm," so to speak: every asset about which it boasted—real estate, various banks and businesses, and rare collections of artifacts and jewels— were completely fictitious, and we've considered stocks like this to be "worthless" for the purposes of calculating loss.

*Id. at* 1305. In irrefutable contrast, LV, Bayshore, 1505 Ponce, the Urbin projects, Commodore, Valencia, Orduna—all of these properties were valuable assets that were already built, were under construction, or heading for construction. None of these projects were unicorns.

*Stein* mandates that the court consider intervening events that may have contributed to the loss. In this case, it is not clear that, but for AK's demand for the return of over $40 million – an

---

[9] When the *Stein* case was remanded to the district court, the proper calculation of the fraud loss after considering causation and intervening factors, resulted in cutting the fraud loss in half, which was affirmed when the case was again appealed. *United States v. Stein*, 964 F.3d 1313, 1320 (11th Cir. 2020).

intervening event – the companies would have spiraled into insolvency. And thus, it is uncertain to what extent any particular investor's loss was caused by Kapoor's improper financial decisions. Mr. Kapoor is taking responsibility for all of these individual investors' losses in agreeing to the Guideline range. He has agreed to the jointly recommended Guideline calculation and to recommend a Guideline sentence. This is a fair resolution of a calculation that is mandated by the Guidelines; but that calculation employs a blunt instrument to accomplish the complicated mission of sentencing. These remain legitimate considerations in evaluating the "circumstances of the offense" and where, within the guideline range, the Court should fix the sentence.

**E. Restitution**

As noted above, the parties have not reached agreement as to the particular investors to whom restitution is owed or the amount of restitution that is due. Unlike the fraud loss calculation, the restitution obligation must be reduced by any money or property received by a potential victim. That is, whether the money was received before or after any alleged fraud was "detected" is not relevant to the restitution calculation. Certain investors already have been made whole (as discussed above) and no additional restitution is due them.

Regarding the open restitution issues, the disagreement (or confusion) arises in significant part from the difficulty in assessing the value of property (discussed in footnote 6 above) transferred to the three largest investors by the receiver during the wind down of Location Ventures. The parties continue to work towards resolving these issues or, failing that, towards narrowing the issues and efficiently presenting their positions to the Court.

**F. Rishi Kapoor's Personal History and Characteristics**

Attached as Composite Exhibit 1 are letters representing the voices of the people who know Mr. Kapoor best, speaking for themselves. The writers include his wife, his eighty-nine-year-old

father, his brothers, his stepmother of forty years, his wife's parents, friends of more than two decades, colleagues who worked beside him for years, a decorated military officer, an architect of long standing in this community, and, notably, investors in his projects, including one who lost a substantial sum. No writer excuses Mr. Kapoor's conduct, and several state plainly that he must be held accountable. What emerges instead is a consistent account, from people who have known him in different settings across different decades, of how he treated those around him, what he has done since his conduct came to light, and what they believe he will do for the rest of his life.

**Investors**

Perhaps the most striking letters come from people who trusted Mr. Kapoor with their money. Francisco Garcia and his wife invested $100,000 in one of the condominium projects and lost it. He begins his letter with that fact, and continues: after the collapse, Mr. Kapoor *"did not avoid us. He came to apologize, explain himself, and allow us to ask whatever questions we wanted."* The Garcias chose to forgive him, invited him and his wife to Christmas dinner, and gave his wife a professional home at their brokerage. Mr. Garcia writes: *"My wife and I have already chosen to give Rishi and Jennie a second chance, even after losing a substantial investment. We did so because we believe Rishi is more than the worst decisions he made."*

Jeffrey Kaplan writes from a rare vantage point: he has practiced law for thirty years, much of it representing victims of investment fraud; he has served two terms on FINRA's National Arbitration and Mediation Committee, and he was himself an early investor in a Location Ventures project. He does not minimize what occurred. His assessment: *"I do not believe he started down this road intending to defraud people. My impression is that he got ahead of himself."* And on what this experience has done: *"Experiences that turn a person's life upside down have a way of teaching humility in a manner that professional success never can. I believe Rishi has had that experience."*

**Family**

Jennie Frank Kapoor, Mr. Kapoor's wife of thirteen years, describes the man she watched deteriorate under stress and heavy drinking, and the man she has watched rebuild since: sober since his arrest, in daily Bible study with her, and tutoring fellow detainees who call him *"Mr. Rishi."* She writes: *"Even in one of the hardest seasons of his own life, he looks for opportunities to lift someone else,"* and *"He speaks often about wanting to become a better husband, a better son, a better brother, a better uncle, a better friend, and simply a better human being. I have watched those words become actions through the choices he makes every day."*

Brij M. Kapoor, his father, is eighty-nine years old and has practiced law for more than fifty years. He writes *"not as an attorney, but simply as a father whose heart has been broken."* His letter, supported by the physicians' statements attached to it, describes five surgeries in the past three years and his son's role as his primary local caregiver before the arrest: *"At this stage of my life, his support is not merely a convenience. It is essential to my ability to remain independent and continue living safely in my own home."*

His older brother Romy Kapoor, an attorney, writes with the candor of someone who does not look away: *"I remain clear-eyed about Rishi's failings and the seriousness of the conduct that brings him before the Court. I also remain convinced that those failings are not the totality of who he is."* He pledges: *"I will continue to stand by him, while also holding him accountable."*

His brother Shiv K. Kapoor, a retired United States Air Force Lieutenant Colonel with twenty-five years of service, writes with a candor that lends weight to the whole collection, telling the Court that distance and his military career limited his contact with his younger brother and that he *"cannot speak broadly about all aspects of his life and character."* What he can attest to is that Rishi reached out every Veterans Day to thank him for his service, and that over the past year he

personally observed Rishi's serious, professional work on the family's commercial property and his help coordinating their father's medical care, efforts he *"viewed ... as meaningful and beneficial to our father and our family."*

Jan Kapoor, Rishi's stepmother, has known him for more than forty years. She writes that what defines him *"is the love he has always shown to his family, the respect he has shown to people from every walk of life, and his willingness to help those around him,"* and she tells the Court what this case has meant for her husband: *"what weighs on my husband more than anything is the fear that he may never see his youngest son again."*

Cheryl and Dennis Frank, his wife's parents, recall that when Mr. Kapoor asked to marry their daughter, Cheryl told him Jennie *"had always been her happy child"* and asked him to keep her that way. They do not gloss over what has followed. They end where few in-laws in these circumstances would: *"We would welcome Rishi back into our family with open arms."*

His brother-in-law Adam Burnett remembers Mr. Kapoor reaching out, unasked, when his own marriage was struggling: *"He just showed up when I needed someone."* Visiting him in custody, he found a man helping other detainees *"with genuine curiosity and compassion"* and living by a simple motto: *"one minute, one hour, one day."* He concludes: *"I believe Rishi Kapoor has the capacity to spend the rest of his life working to make things right."*

**Colleagues**

Raymond Gonzalez worked beside Mr. Kapoor for more than a decade across three companies, ultimately as Location Ventures' chief technology officer: *"I have seen Rishi succeed, I have seen him fail, and I have seen how he responded after failing. That final chapter tells me more about his character than the first two."* He adds: *"He repeatedly told me that, if given the opportunity, he wants to find a way to make investors whole."*

Boris Grandison, a project manager on several Location Ventures developments, describes an employer who once threatened to walk away from a condominium sale rather than let a buyer mistreat his staff, and concludes that Mr. Kapoor's abilities *"can be redirected toward responsible and productive work."*

Reinaldo Borges, a Miami architect who designed projects for Location Ventures, writes: *"I would have no hesitation about working with Rishi again in the future once he is able to return to productive work."*

**Friends of long standing**

Three friendships of more than twenty years, formed at the University of Miami, appear in these letters. Harrison Winter, his fraternity big brother, reconnected with him during this case and writes: *"If you had asked me twenty years ago to describe Rishi, I would have talked about his leadership and ambition. If you asked me today, I would instead tell you about his gratitude."* Douglas Jay Goldman, an educator and his closest college friend, describes *"someone who valued relationships, believed in serving others, and wanted to leave people and places better than he found them."* Lee DeDore, a friend of more than two decades, writes that Mr. Kapoor's *"mistakes do not define the entirety of his character."*

**Community leaders**

Colonel James Fowler served thirty-eight years in the United States Air Force in commands that required him to judge the integrity of thousands under his authority; Ramona Fowler built healthcare consulting companies and serves on the boards of the Community Foundation of Broward and Coral Gables Trust Company. They write together: *"In our conversations with him, he has never attempted to convince us that he was a victim or to shift blame to others."* Their conclusion, drawn from careers spent evaluating character: *"Accountability and mercy are not*

*mutually exclusive,"* and *"we do not believe he will ever again appear before a court as a criminal defendant."*

Every writer knew of the guilty plea when they wrote. None asks the Court to excuse what Mr. Kapoor did; many say expressly that he must answer for it. We submit their letters because the picture they paint, of a man who faced the people he hurt, who was repairing himself before the law required it, and whose family and community remain committed to his accountability and his future, bears directly on the person the Court will sentence.

Finally, Mr. Kapoor submits herewith as Exhibit 2 his own statement to the Court which expresses his acceptance of responsibility; his deep remorse for his criminal conduct and for the harm it has caused the investors and his family; and his efforts towards rehabilitation and redemption.

## CONCLUSION

This case has none of the nefarious attributes of fraud cases in which a sentence in excess of a decade of prison typically is imposed. Rishi Kapoor was not selling snake oil to unsuspecting investors. He did not operate a Ponzi scheme. He was not selling a defective product, a dangerous medical device, or unicorns. He was successfully developing real estate and building homes and apartments, and office buildings. He admittedly lost his path and accepts full responsibility for his criminal conduct that has resulted in substantial losses to the investors who placed their trust in him.

Mr. Kapoor is not Robin Hood or Jean Valjean, but he is also not Bernie Madoff, or Charles Ponzi, or Elizabeth Holmes or Jean Joseph operating a Ponzi scheme from his prison cell. In this context the fraud loss table is an imprecise and poor proxy for his level of culpability or the seriousness of his offenses.

Considering the §3553(a) factors: Rishi Kapoor is a first-time offender. Though he was well-paid in his business, he was not surreptitiously pocketing all of his investors' money (the accusation of "lavish spending" notwithstanding). He worked tirelessly for years, developing the properties, building houses, and building apartments not just for wealthy south Florida millionaires, but also housing for students and lower middle class first-time property owners or apartment dwellers. Hundreds of millions of dollars passed through his hands successfully as he invested in, and developed, numerous properties in South Florida. He contributed substantial taxes to the South Florida community and employed scores of people from accountants to laborers. He struggled to keep the companies afloat when his primary investor threatened, and then abandoned, them.

In addition, Kapoor has provided information to the SEC since his plea was entered assisting in the effort to "claw back" money to distribute to the investors who are deserving of restitution. He has also provided information to the government about possible criminal activity involving other individuals which, though not currently meriting a substantial assistance reduction, is worth considering in evaluating the full scope of the § 3553(a) factors.

He has agreed to the forfeiture of the only assets of significant value that he has. As the PSR reveals, Mr. Kapoor has nothing now, other than his wife and his family. He was denied bond and has been in the Miami detention center for nearly six months. He knows he has several years ahead during which he will continue to endure separation from his wife and his family, including his elderly, infirm father.

Rishi Kapoor is not in need of deterrence. The public needs no protection from him when he is released, whether that day comes tomorrow, or in a decade. In evaluating the

punishment that Rishi Kapoor deserves, even a low-end sentence is a high sentence; and a mid-range sentence is too high.

We urge the Court to impose a modest sentence that reflects Rishi Kapoor's minimal (and now non-existent) criminal disposition. He deserves punishment, but not castigation—a sentence that is sufficient, but not more than necessary.

Dated: August 24, 2026

Respectfully submitted,

RASKIN & RASKIN, P.A.

*/s/ Jane Serene Raskin*
Jane Serene Raskin
Florida Bar No. 848689
jraskin@raskinlaw.com
2525 Ponce De Leon Blvd., Ste. 300
Coral Gables, FL. 33134
Telephone: (305) 444-3400

GARLAND, SAMUEL & LOEB, P.C.

/s/ *Donald F. Samuel*
Donald F. Samuel
Georgia Bar No. 624475
Admitted Pro Hac Vice
3151 Maple Drive, N.E.
Atlanta, Georgia 30305
Telephone: (404) 262-2225
dfs@gsllaw.com

SHAHADY & WURTENBERGER, PA

/s/ *Fred A. Schwartz*
Fred A. Schwartz
Florida Bar No. 360538
200 E. Palmetto Park Road, Ste. 103
Boca Raton, Fl. 33432
Telephone: (561) 910-3064
fschwartz@swlawyers.law

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 24th day of August, 2026, the undersigned electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

BY: *_/s/ Jane Serene Raskin*
Jane Serene Raskin